UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE NEBGEN, PARVIZ GHAHRAMANI, and THERAHOLDINGS AG (SA Ltd.),

Plaintiffs,

– against –

JEROME J. SCHENTAG, MARY P. McCOURT, LAWRENCE MIELNICKI, JULIE HUGHES, and THERASYN SENSORS, INC.,

Defendants.

**OPINION AND ORDER**

18 Civ. 8410 (ER)

Ramos, D.J.:

George Nebgen ("Nebgen"), Parviz Ghahramani ("Ghahramani"), and TheraHoldings AG (SA Ltd.) ("TheraHoldings") (collectively, "Plaintiffs") bring this action against Jerome Schentag ("Schentag"), Mary P. McCourt ("McCourt"), Lawrence Mielnicki ("Mielnicki"), Julie Hughes ("Hughes"), and TheraSyn Sensors, Inc. ("TheraSyn") (collectively, "Defendants"), asserting, *inter alia*, breach of three agreements that established their joint venture to commercially exploit patents for a drug delivery technology developed by Defendants. Doc. 1. In the instant motion, Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(3), or in the alternative, to transfer this case to the Western District of New York pursuant to 28 U.S.C §§ 1404(a), 1406(a). Doc. 46. For the reasons set forth below, Defendants' motion to dismiss is GRANTED and Defendant's motion to transfer venue is DENIED.

### I. FACTUAL BACKGROUND

Defendants allege that they developed a drug delivery technology called "cholestosome technology" in their respective universities located in the Western part of New York state. Doc.

46, 1.  Cholestosome technology provides for specialized vesicles, or pills, that can carry a wide variety of therapeutics, including proteins, peptides, genes, and other molecules that are not easily absorbed by the stomach.  Doc. 1, 4.  The main purpose of cholestosome technology is to allow injectable proteins and peptides, such as insulin, to be delivered orally by getting past the stomach and into the intestine.  *Id.*  McCourt and Mielnicki are science research professionals and faculty members in the Chemistry Department of Niagara University in Niagara, NY; Schentag is an Emeritus Professor of Professional Sciences and Pharmacy at the University of Buffalo in Buffalo, NY; and Hughes is a research technologist at Niagara University.  Doc. 1, 7.  Between March 20, 2006 and August 23, 2016, the individual Defendants filed a series of domestic and foreign patents for cholestosome technology.  *Id.* at 4–6.  Schentag and Hughes are listed as named inventors on some of the patents.  *Id.*  During all relevant times, the individual Defendants lived and worked in Erie and Niagara Counties.  Docs. 42–46.

In 2013, Schentag met Plaintiff Nebgen, who had experience in venture capital fundraising, at a financing conference in California and asked him to join him in developing and commercially exploiting the cholestosome technology.  Doc. 1, 8.  Nebgen agreed and began working with Schentag to form the venture and secure funding.  *Id.* at 1, 17.  Nebgen, a Swiss resident, owned a Swiss corporation named TheraHoldings, which Plaintiffs allege became the holding company for the cholestosome technology family of intellectual property.  Doc. 42.  The parties agreed that Nebgen would be Chairman of TheraHoldings and Schentag its Chief Scientific Officer.  Doc. 42-4; Doc. 1, 31.  Many of the discussions between Schentag and Nebgen occurred over the phone and by email.  Doc. 63, 3.  They also attended several in-person meetings in Manhattan, which is located in the Southern District of New York.  *Id.*

According to Defendants, Nebgen represented that he had the contacts and ability

2

necessary to raise significant funds to develop, license, and sell the cholestosome technology and that he would personally finance the technology's development and pay for the related legal expenses. Doc. 64, 2. Nebgen denies that he ever made these representations, however, he worked with Schentag, and later Ghahramani, to fundraise for the development of the cholestosome technology. Doc. 1, 16. On October 2, 2013, Nebgen and Schentag met with Stern Aegis, a venture capital firm Nebgen solicited to fund the cholestosome technology, in Manhattan. Doc. 61, 4 n.1. Two weeks later, on October 16, 2013, Stern Aegis emailed Nebgen and Schentag stating that it was "impressed by TheraHoldings' two principal technologies": Oral Insulin and Brake Technology.[1] *Id.*; Doc. 63-1.

On November 15, 2013, Schentag, McCourt, and Mielnicki entered into three contemporaneous written agreements with Nebgen to exploit the patents for cholestosome technology. Doc. 1, 16. The two main agreements signed by the parties were the "Share Purchase Agreement" and the "Contribution Agreement" and are governed by Swiss law. *Id.* at 9, 15. The parties also signed a Shareholders Agreement establishing the corporate structure of TheraHoldings and the shareholders' rights. Doc. 42-3.

Nebgen participated in the agreements through his personal holding corporation, STEP UP Holding AG ("STEP UP"); Schentag participated through his personal holding company, TheraSyn. Doc. 1, 8–9. Under the Share Purchase Agreement, STEP UP sold 75% of its shares in TheraHoldings to Schentag, McCourt, and Mielnicki who agreed they would "continuously contribute intellectual property assets in kind" to TheraHoldings, which served as the holding

---

[1] Schentag, Nebgen, and Ghahramani were involved in two separate joint ventures to develop and commercialize two separate technologies with pharmaceutical companies: cholestosome technology and Brake technology. Doc. 61, 8. The agreements related to Brake technology were disputed in a case before Judge Gregory H. Woods, 17 Civ. 8734, *Schentag v. Nebgen et al.* ("Judge Woods case").

company for the intellectual property. *Id.*; *see* Doc. 42-1 (listing several cholestosome technology patents that were initially contributed).

The Contribution Agreement detailed Defendants' obligation to contribute intellectual property related to cholestosome technology on a "recurring basis." Doc. 42-2. Schentag, McCourt, and Mielnicki signed and notarized the agreements on November 18, 2013 in a bank located within the Western District of New York. Doc. 42, 3. Defendants allege that the cholestosome technology was not to be immediately assigned to TheraHoldings and that there were conditions in place, like Nebgen following through on his representations to finance the technology and obtaining permission from Defendants' respective universities. Doc. 64, 2.

The agreements contain forum selection and choice-of-law clauses that point to Switzerland and Swiss law respectively. The Share Purchase Agreement contains the following forum selection clause:

> Exclusive jurisdiction for all disputes arising out of or in connection with this Share Purchase Agreement…shall be subject to the ordinary courts at the registered office location of the Company.

Doc. 42-1. The "Company" refers to TheraHoldings, which is registered in Switzerland. *Id.* at 2. It also contains a choice-of-law clause establishing Swiss law as governing its interpretation. Doc. 42. The Contribution Agreement does not include a forum selection clause but contains a Governing Law and Jurisdiction" section that states: "This Agreement shall be governed by and construed in accordance with the laws of Switzerland." Doc. 42-2.

On September 30, 2015, Schentag, McCourt, and Mielnicki sold some of their TheraHoldings shares to Ghahramani, a New Jersey resident, making him a 5% owner of TheraHoldings. Doc. 1, 11. Schentag, Nebgen, and Ghahramani allegedly had several meetings to fundraise for the venture in Manhattan (and some in New Jersey) throughout 2015 during

4

which Schentag represented that TheraHoldings owned the cholestosome technology. Doc. 61, 8. Allegedly, Plaintiffs have not contributed any money to TheraHoldings or the patent, research, or development costs of cholestosome technology. Doc. 64, 5. Instead, they focused their energies on Brake Technology, which according to Defendants was the subject of the Stern Aegis meeting and the meetings in Manhattan. *Id.* at 6.

By early 2017, the relationship between the parties had deteriorated significantly. *Id.* at 9. Defendants allege that Plaintiffs' involvement tainted the funding pool for cholestosome technology as both had negative reputations with potential investors. *Id.* Defendants claim that by March of 2017, Plaintiffs ceased all fundraising efforts. *Id.* Schentag emailed Plaintiffs on May 31, 2017, to say that Defendants would not assign any of the cholestosome technology patents to TheraHoldings until it had assets to develop the technology and it committed to pay the patent costs. *Id.* at 10. The parties' disagreement came to a head on October 3, 2017, when Schentag, writing from the Western District of New York on behalf of McCourt, Mielnicki, and himself, emailed Nebgen demanding rescission of the 2013 TheraHoldings agreements based on Nebgen's alleged failure to raise venture capital for the patents. Doc. 61, 12–13.

Nebgen and Ghahramani allege that this email was part of a scheme, hatched by Schentag, McCourt, and Mielnicki between 2015 and 2017, to steal their interest in the cholestosome technology. *Id.* at 12. The essence of the scheme was to renege on the agreements, demand rescission, and misappropriate the cholestosome technology for Defendants' benefit. *Id.* On May 1, 2018, McCourt executed an assignment agreement (backdated to October 4, 2013) purporting to assign a patent application ("'831 Patent") to TheraSyn, although the same patent had allegedly been assigned to TheraHoldings on November

15, 2013. Doc. 46, 26.

Plaintiffs' filed the instant action on September 14, 2018 seeking a declaratory judgment that (1) the 2013 TheraHoldings agreements are valid and in force, (2) are not rescinded, and (3) that TheraHoldings is the rightful owner of the cholestosome technology previously assigned to it. Doc. 1. Plaintiffs also seek an injunction directing Defendants to take all necessary steps to cooperate with the process of applying for and protecting the intellectual property embodying cholestosome technology. Plaintiffs allege breach of fiduciary duty against Schentag individually in his capacity as Chief Scientific Officer of TheraHoldings. Finally, Plaintiffs seek a correction of the named inventors on certain patents and patent applications that include Schentag and Hughes as named inventors. On March 7, 2019, Defendants moved to dismiss the Complaint. Doc. 1.

## II. LEGAL STANDARD

### A. Improper Venue

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd. v. Kates*, 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)). "When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper." *Id.* (citing *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401 B.R. 589, 596 (S.D.N.Y. 2009)). To meet this burden, the plaintiff must plead facts sufficient for prima facie showing of jurisdiction or venue. *Glasbrenner*, 417 F.3d at 355 (citing *CutCo Indus.*

*v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).[2] Venue is proper in the chosen forum if: (1) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located; (2) a "substantial part" of the events giving rise to the claim occurred in the district; or (3) the defendant is subject to personal jurisdiction in the district and "there is no district in which an action may otherwise be brought." 28 U.S.C. § 1391(b).

### B. Venue Transfer

Both § 1404(a) and § 1406(a) allow a case to be transferred to another federal district in which the action might have been brought. *See* 28 U.S.C §§ 1404(a), 1406(a). To effectuate a transfer, a determination must be made that the receiving court must be a proper venue and must possess personal jurisdiction over the defendants. *See Carlton Int'l, PLC. v. American Concord Techage, Inc.*, 94 Civ. 3750(JFK), 1995 WL 450274, at *4 (S.D.N.Y. July 31, 1995) (holding that § 1404(a) does not permit transfer to a district with which the defendant has no contact) (citing *Foster-Milburn Co. v. Knight*, 181 F.2d 949, 952 (2d Cir. 1950)); *see also Gibbons v. Fronton*, 661 F. Supp. 2d 429, 434 (S.D.N.Y. 2009) (holding that § 1406(a) only permits transfer to a forum in which venue is proper and the defendants are subject to personal jurisdiction) (citing *Volkswagen De Mexico, S.A. v. Germanischer Lloyd*, 768 F. Supp. 1023, 1029 (S.D.N.Y. 1991)).

Section 1404(a) allows a court to transfer a civil action to the more convenient district court if the action presents issues and requires witnesses that make one district more convenient than another. *Wyler-Wittenberg v. MetLife Home Loans, Inc.*, 899 F. Supp. 2d 235, 248

---

[2] This is the standard when the court addresses jurisdiction or venue based solely on pleadings and affidavits. At an evidentiary hearing or trial, "the plaintiff must demonstrate [venue or jurisdiction] by a preponderance of the evidence." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (citing *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).

7

(E.D.N.Y. 2012) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). Section 1404(a) is only available when the court initiating the transfer is the proper venue and has personal jurisdiction over the defendant. *Kelly-Brown v. Winfrey*, 11 Civ. 07875(PAC), 2013 WL 6574918, at *1 (S.D.N.Y. Dec. 12, 2013) (citing *Lafferty v. St. Riel*, 495 F.3d 72, 76–77 (3d Cir. 2007)).

When the district court initiating the transfer is not the proper venue of the action, § 1406 governs, and a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). "Whether dismissal or transfer is appropriate lies within the sound discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993). The purpose of § 1406(a) is to "avoid[] the injustice which had often resulted to plaintiffs from dismissal of their actions merely because they had made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn." *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (quotations omitted).

### III. DISCUSSION

#### A. Motion to Dismiss for Improper Venue

##### 1. First and Second Cause of Action

The first two causes of action in the Complaint are based on the Share Purchase Agreement and the Contribution Agreement. While the second claim references the shares Ghahramani purchased in September 2015, it arises out of the same events surrounding the execution of the 2013 TheraHoldings agreements. Doc. 1, 30. Accordingly, the Court will focus its inquiry on those events. Doc. 73, 3.

In both counts, Plaintiffs ask the Court to issue a declaratory judgment stating that the

2013 TheraHoldings agreements are valid and in force, that they were not rescinded, and that TheraHoldings is the rightful owner of the cholestosome technology patents. Doc. 1, 28–29. In order to determine the validity of these allegations, the Court needs to analyze the circumstances surrounding negotiation and execution of the contracts at issue. "In the context of contract disputes, relevant factors [for determining venue] include (1) the locations where the contract was negotiated, (2) where the work was to be performed, and (3) where the contract was allegedly breached." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 742 (S.D.N.Y. 2013) (citations omitted) (numerals added).

        a.    Location of Contract Negotiations

Nebgen alleges that he negotiated the terms of the 2013 TheraHoldings agreements with Schentag (who also represented McCourt and Mielnicki) in the Southern District of New York through several in-person meetings to discuss the terms of the agreement and meet with potential investors. Doc. 63, 3. He further asserts that many of the discussions occurred over the phone and that he and Schentag frequently communicated by email. Nebgen does not state where the he was located during these telephone and email communications. *Id.* Defendants state they were located in Erie County in the Western District of New York when they exchanged drafts of the agreements. Doc. 42, 2–3.

Nebgen points the Court to a single meeting that occurred in this District prior to signing the 2013 TheraHoldings agreements: October 2, 2013, when he and Schentag met a potential investor, the venture capital firm Stern Aegis, at their offices in Manhattan. *Id.* Nebgen alleges that he and Schentag also discussed the terms of the venture during this meeting. *Id.* However, he does not allege that a significant event or omission material to his claims occurred during this October 2013 trip to Manhattan. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005)

9

("[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claims must have occurred in the district in question…."). The other meetings Nebgen specifically references all occurred after 2013 and thus do not address the question of where the 2013 TheraHoldings agreements were negotiated. *Id.* at 4–5. Accordingly, Plaintiff has not sufficiently plead that the 2013 agreements were negotiated in this District.

        b. Location of Contract Performance

Next, the 2013 TheraHoldings agreements do not specify where the work was to be performed. However, Plaintiffs claim that under the agreements, Defendants agreed to contribute their interests in the cholestosome patents to TheraHoldings on an ongoing basis. Doc. 1, 9–10. Defendants argue that any claims TheraHoldings may have had to the intellectual property which existed in November 2013 were waived and discharged by Nebgen's material breach. Doc. 1, 14. And that, in any event, their contribution of the intellectual property would have occurred in the Western District of New York, where they live and work, where they developed the technology, and where they executed the patent applications. Doc. 73, 2–3.

Defendants further argue they only entered into the 2013 TheraHoldings agreements based on Nebgen's representations, which turned out to be false, that he would obtain venture capital, license and sell the cholestosome patents, and finance the development of U.S. and foreign legal patent expenses. *Id.* at 13. However, Nebgen explicitly denies that the agreements required him to secure funding. *Id.* at 16. Nebgen claims that under the agreements he provided no further representations other than those explicitly listed in the Contribution Agreement. *Id.* at 15. The Contribution Agreement represents that TheraHoldings was to acquire the patent rights without recourse and that TheraHoldings assessed the value of the intellectual property rights and found they may represent a valuable asset. Doc. 42-2. Accordingly, the agreements do not

indicate performance was required in the Southern District of New York.

            c. <u>Location of Alleged Contract Breach</u>

Lastly, Plaintiffs allege that Defendants' request for rescission and statements that TheraHoldings does not own the intellectual property is a breach of the 2013 TheraHoldings agreements. The alleged breach of contract occurred on October 3, 2017, when Schentag demanded rescission of the 2013 TheraHoldings agreements and stated that the intellectual property related to cholestosome technology does not belong to TheraHoldings. Doc. 1, 13–14. Schentag claims that he sent this email from his computer in the Western District of New York. Doc. 42, 4. Plaintiffs further claim that between 2015 and 2017 "Schentag hatched a scheme to steal Plaintiffs' interest in the cholestosome technology" and that McCourt and Mielnicki joined him in that scheme. *Id.* at 12. Plaintiffs do not provide the Court with details of where this alleged scheme occurred, but presumably such a scheme would have been "hatched" in the Western District of New York, where Schentag, McCourt, and Mielnicki live.

In sum, because Plaintiffs have not established the agreements were negotiated, were to be performed, or were breached in the Southern District of New York, this District is not a proper venue for Plaintiffs' contract claims.

       2. *Third Cause of Action*

Similarly, venue is improper in the Southern District of New York for the breach of fiduciary duty claim. Nebgen accuses Schentag of breaching his fiduciary duty as Chief Scientific Officer of TheraHoldings by claiming that the cholestosome technology and related patents do not belong to it. Doc. 40, 5. Schentag allegedly also acted against the interests of TheraHoldings by inducing McCourt to assign the '831 patent application family to TheraSyn (Schentag's holding company) even though that patent was already assigned to TheraHoldings.

Doc. 1, 32. However, there is no evidence that these alleged breaches occurred in the Southern District of New York. Schentag sent the October 3, 2017 email disclaiming TheraHoldings' ownership of the patents from the Western District of New York. Doc. 40, 3, and McCourt executed the assignment of the '831 patent in the Western District of New York. Doc. 43, 1.

Plaintiffs argue that the fiduciary duty arose from the joint venture formed in Manhattan. Doc. 61, 12. However, the § 1404(a) standard requires that a significant event or omission giving rise to the breach of fiduciary claim occurred in this District. As discussed above *supra* Part A(1), Plaintiffs have not sufficiently plead that the alleged negotiations, performance, or breach of the agreements took place in this District. Additionally, Schentag executed the agreements in the Western District of New York. Doc. 42, 3. Accordingly, Plaintiffs have not demonstrated that the breach of fiduciary duty claim arose in this District.

### 3. *Fourth Cause of Action*

Lastly, the Southern District of New York is an improper venue for the fourth cause of action, which challenges the inclusion of Schentag and Hughes as named inventors on certain cholestosome technology patents. In support of this claim, Plaintiffs merely assert that it arises from the patent rights assigned to TheraHoldings by the contracts negotiated in Manhattan. Doc. 61, 12. The sole factual allegation is that Schentag and Hughes "contributed nothing to any of the inventions comprising the cholestosome technology that would qualify them as inventors within the meaning of 35 U.S.C. § 100." Doc. 73, 4. Yet the cholestosome technology was invented and developed in the Western District of New York and Plaintiffs have not demonstrated that the 2013 TheraHoldings agreements had material connections with the Southern District of New York. Doc. 40, 6.

In sum, Plaintiffs have not met their burden of making a *prima facie* showing of venue in

this District. Defendants' motion to dismiss for improper venue is GRANTED.

B. **Forum Selection Clause**

Additionally, even if the action could have been brought here, it must be dismissed because the forum selection clause in the Share Purchase Agreement requires that it be brought in Switzerland. Forum selection clauses can be either permissive or mandatory. "Contracting parties may intend to agree on a *potential* situs for suit.... A so-called permissive forum clause only confers jurisdiction in the designated forum, but does not deny plaintiff his choice of forum, if jurisdiction there is otherwise appropriate." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 386 (2d Cir. 2007). "[A]n agreement *conferring* jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion…." *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc.*, 22 F.3d 51, 53 (2d Cir. 1994).

Courts interpret mandatory forum selection clauses as meaning that "contracting parties [agreed] in advance on a forum where any and all of their disputes *must* be brought…." *Id*. (emphasis added). A mandatory forum clause is given a presumption of enforceability. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 20 (1972) (finding forum clause language in contract was "mandatory and all-encompassing" when it used the word "must"). Federal law governs the *enforceability* of a forum selection clause, based on the following four-part analysis: (1) "whether the clause was communicated to the party resisting enforcement"; (2) whether the clause is "mandatory or permissive, i.e., …whether the parties are required to bring any dispute to the designated forum or simply permitted to do to"; (3) "whether the claims and parties involved in the suit are subject to the forum selection clause"; and (4) if these three conditions are met, then the resisting party can rebut the presumption of enforceability by making a strong

13

showing that enforcement would be unreasonable or unjust, or that the clause was invalid for fraud or overreaching. *Id.* at 15; *accord Fifth & Fifty-Fifth Residence Club Ass'n v. Vistana Signature Experiences, Inc.*, 2018 U.S. Dist. LEXIS 169590, at *20 (S.D.N.Y. Sept. 28, 2018).

However, the question of what law should govern the *interpretation* of a forum selection clause when the contract also contains a choice of law clause is complex. The Second Circuit has held that "where a contract contains both a valid choice-of-law clause and a forum selection clause, the substantive law identified in the choice-of-law clause governs the *interpretation* of the forum selection clause, while federal law governs the *enforceability* of the forum selection clause." *Martinez v. Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014). Questions 1 and 4 of the *M/S Bremen* framework go to enforceability and are resolved under federal law, while questions 2 and 3, go to interpretation, and are generally resolved under the law designated in the parties' agreement. *Ujvari v. 1stdibs.com, Inc.*, No. 16 CIV. 2216(PGG), 2017 WL 4082309, at *7 (S.D.N.Y. Sept. 13, 2017).

There are instances where courts may cite federal law when interpreting a forum selection clause in a contract that also contains a choice of law clause. *Id.* For example, when the agreement contains a choice-of-law provision applying another nation's law, but the parties nonetheless cite to federal law when addressing interpretive questions 1 and 2 referenced above. *Id.* Accordingly, parties may choose to not rely on any distinctive features of the selected law and instead apply general contract law principles and federal precedent to discern the scope and meaning of the forum selection clause. *Id.*; *see also Phillips*, 494 F.3d at 386 (same); *Arial Techs., LLC v. Aerophile S.A.*, No. 14 Civ. 4435(LAP), 2015 WL 1501115, at *3 (S.D.N.Y. Mar. 31, 2015) ("[A] court need not apply foreign law to interpret a forum selection clause unless the parties do so….").

14

Defendants argue that this Court should apply federal law to interpret the meaning and scope of the forum selection clause because Plaintiffs cited no law regarding its interpretation. Doc. 73, 8 (citing *Arial Techs.*, 2015 U.S. Dist. LEXIS 43237, at *9 (applying federal law where defendants only relied on federal law and plaintiff relied on no law). The parties do not rely on any distinctive features of Swiss law, in other words, they do not cite to or reference any decision or principle of Swiss law and instead rely on federal law. *Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S*, No. 08–CV–6333(KMK), 2012 WL 5426459, at *6 (S.D.N.Y. Sept. 27, 2012).

When Defendants did mention Swiss law, it was to point out that similar to the United States, Switzerland interprets forum selection clauses broadly and would construe the forum selection clause at issue here as encompassing all claims in the Complaint. Doc. 73, 8–9; *see Prod. Res. Grp.*, 2012 WL 5426459, at *6 (stating parties did not rely on distinctive features of foreign law when their only reference to it was for the single proposition that the foreign forum would accept jurisdiction over an action involving United States federal law); *see also Amto, LLC v. Bedford Asset Mgmt., LLC*, 168 F. Supp. 3d 556, 565 n.9 (S.D.N.Y. 2016) (finding where foreign law citations merely serve to illustrate consistency with federal law, courts will apply federal law). Accordingly, the Court will apply federal precedent to both the enforcement and interpretation of the forum selection clause at issue.

1. *Share Purchase Agreement*[3]

    a. <u>Mandatory Forum Selection Clause</u>

Defendants argue that the Share Purchase Agreement requires Plaintiffs to bring this action in Switzerland. Doc. 40, 9. The Share Purchase Agreement contains both a forum

---

[3] The Shareholders Agreement also contains a forum selection clause that confers "exclusive jurisdiction" in Switzerland for "[a]ll disputes arising out of or in connection with this Agreement." Doc. 42-3.

selection clause and a choice-of-law clause. Doc. 42-1. The forum selection clause states that "[e]xclusive jurisdiction for all disputes arising out of or in connection with this Share Purchase Agreement…shall be subject to the ordinary courts at the registered office location of [TheraHoldings]." *Id.* The choice-of-law clause states that the agreement "is governed by and construed in accordance with substantive Swiss law." *Id.*

The parties do not dispute that the forum selection clause was reasonably communicated to Nebgen when he signed the Share Purchase Agreement. *Fifth & Fifty-Fifth*, 2018 U.S. Dist. LEXIS 169590, at *20 (finding that courts in this Circuit assume forum selection clauses stated in clear and unambiguous language were reasonably communicated to plaintiff). Nor do they dispute that the "exclusive jurisdiction" language in the clause render it mandatory. "[A]n agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion...." *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc.*, 22 F.3d 51, 53 (2d Cir. 1994). Accordingly, the language of the forum selection clause is mandatory and enforceable.

### b. Whether the Claims and Parties are Subject to the Clause

Plaintiffs contend that there is no dispute arising out of the Share Purchase Agreement because neither party contests their ownership interests in TheraHoldings' shares, but rather in TheraHoldings' right to the cholestosome technology intellectual property as set forth in the Contribution Agreement. Doc. 61, 5. They further argue Defendants have not shown Swiss law would still apply the forum selection clause when no claims arise out of the Share Purchase Agreement. *Id.* However, as the Court noted above, federal law applies here.

Furthermore, the applicability of a forum selection clause is governed by objective consideration of the language of the clause. *Armco Inc. v. N. Atl. Ins. Co.*, 68 F. Supp. 2d 330,

16

338 (S.D.N.Y. 1999). Courts have identified at least two categories of terms describing the scope of a forum selection clause: (1) a narrower category that includes terms such as "arise out of," "arise from," or "arising under," and (2) a broader category that includes terms such as "in connection with," "relating to," or "associated with." *Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S*, 907 F. Supp. 2d 401, 412 (S.D.N.Y. 2012) (citing *Phillips*, 494 F.3d at 389). Here, the forum selection clause in the Share Purchase Agreement includes both categories as it states that "[e]xclusive jurisdiction for all disputes *arising out of or in connection with* this Share Purchase Agreement" shall be subject to the ordinary courts of Switzerland (where TheraHoldings is registered). Doc. 74-1 (emphasis added).

The factual record shows the claims arise out of and in connection with the Share Purchase Agreement. In the October 3, 2017 rescission email, Schentag explicitly stated that Defendants only entered into the agreements because of Nebgen's representations about his ability to obtain venture capital. Doc. 1, 12–13; *see Armco, Inc.*, 68 F. Supp. 2d at 338 (holding claims can arise out of or in connection to contract where plaintiffs sue for breach of contract, allege lack of performance required by contract, or dispute either party's obligation under contract). Furthermore, Plaintiffs bought and sold TheraHoldings' shares in exchange for Defendants' contribution of intellectual property for the cholestosome technology, a transaction which is embodied in both the Share Purchase Agreement and the Contribution Agreement. Doc. 1, 9, 11.

Plaintiffs also allege that the fiduciary duty underlying the third cause of action arises from the joint venture, and that the claim to correct the names of the patent inventors at issue in the fourth cause of action, arises from the patent rights assigned to TheraHoldings by the contracts negotiated here. Doc. 61, 12; *see Armco Inc.*, 68 F. Supp. 2d at 338 (finding broad

17

language in forum selection clause encompassed claims asserted in complaint that grow out of contractual relationship or if "the gist" of claims is breach of contractual relationship); *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 563 (S.D.N.Y. 2013) (finding where party resisting enforcement of forum selection clause relied on contract relationship to bring claims, those claims arise "in connection with" contract). Accordingly, Plaintiffs' claims arise out of both the Share Purchase Agreement and the Contribution Agreement and are subject to the foreign selection clause.

          c.    <u>Whether Resisting Parties Have Sufficiently Rebutted Enforcement</u>

Finally, Plaintiffs have not made any showing that bringing the action in Switzerland would be unreasonable or unjust, or that the clause is invalid for fraud or overreaching. *Fifth & Fifty-Fifth*, 2018 U.S. Dist. LEXIS 169590, at *20. Dismissal is warranted if the non-moving party shows that (1) the forum selection clause was the result of fraud or overreaching, (2) the law to be applied in the selected forum is fundamentally unfair, (3) enforcement would contravene a strong public policy of the forum state, or (4) trial in the selected forum would be so difficult and inconvenient that plaintiffs will effectively be deprived their day in court. *Phillips,* 494 F.3d at 392. "There is a strong presumption in favor of the validity of international forum selection clauses and the party objecting to such a clause 'bears a heavy burden.'" *Albany Ins. Co. v. Banco Mexicano, S.A.*, 182 F.3d 898 (2d Cir. 1999) (internal citations omitted).

Plaintiffs have not plead facts that meet that heavy burden. The fact that Nebgen freely negotiated the contracts weakens Plaintiffs' position. *M/S Bremen*, 407 U.S. at 12–13 (finding "freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power" should be given full effect). In sum, Plaintiffs have not shown how they satisfy any of the four ways to rebut the presumption of enforceability.

*2. Contribution Agreement*

Next, Plaintiffs argue the lack of a forum selection clause in the Contribution Agreement means they do not need to litigate TheraHoldings' ownership of the cholestosome technology, or the claims arising from it, in Switzerland. Doc. 61, 5. Defendants respond that the Contribution Agreement cross-references the Share Purchase Agreement, which was signed on the same day, and that it was an oversight to not include the forum selection clause. Doc. 40, 9. *Id.* Specifically, the Contribution Agreement states that "[a]s agreed in the share purchase agreement of November 15, 2013 between STEP UP Holding AG and Contributors, no additional shares are issued" and Defendants make the same contribution in kind of intellectual property referenced in the Share Purchase Agreement. Docs. 42-1, 42-2.

The Court agrees with Defendants that a collective review of the 2013 TheraHoldings agreements reveal that the parties intended to resolve their disputes in Switzerland. Doc. 73, 7. Both the Share Purchase Agreement and the Shareholders' Agreement have mandatory forum selection clauses selecting Switzerland as the situs for dispute resolution and all three agreements have choice-of-law clauses that indicate Swiss law governs their interpretation. Doc. 42. "When interpreting contracts, it is accepted that separate agreements executed contemporaneously and that are part of a single transaction are to be read together." *Prod. Res. Grp., L.L.C.*, 907 F. Supp. 2d at 413 (collecting cases); *see also Quebecor World (USA), Inc. v. Harsha Assocs., L.L.C.*, 455 F. Supp. 2d 236, 239 (W.D.N.Y. 2006) (collecting Second Circuit cases holding where two or more written agreements between same parties concerning same subject were contemporaneously executed, forum selection clause in one can be applied to others). Accordingly, the 2013 TheraHoldings agreements provide for Swiss law to govern and for disputes to be resolved in Switzerland.

19

This Court does not have jurisdiction to transfer the action to Switzerland. *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 134 S. Ct. 568, 574, 187 L. Ed. 2d 487 (2013) (holding appropriate way to enforce forum selection clause pointing to state or foreign forum is through *forum non conveniens*). Here, the forum selection clause provides for exclusive jurisdiction in Switzerland and does not permit venue in a federal forum, therefore, the Court must dismiss the case. *See Fiorenza v. U.S. Steel Int'l, Ltd.*, 311 F. Supp. 117, 120 (S.D.N.Y. 1969) (finding federal district courts have ability to dismiss, rather than transfer, an action for *forum non conveniens* when alternative forum is state court or court in foreign jurisdiction). Because the Court resolves this matter on the basis of the forum selection clauses, it need not reach the *forum non conveniens* doctrine or Defendants' request for transfer to the Western District of New York. *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 719 n.4 (2d Cir. 2013). Accordingly, Plaintiffs' claims are dismissed in their entirety.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED and Defendants' motion to transfer venue is DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 40, and close the case.

It is SO ORDERED.

Dated: March 31, 2020
      New York, New York

_____
Edgardo Ramos, U.S.D.J.